## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CLIFTON WHITE,

     Plaintiff,

v.                                       Case No. 21-cv-1207-SCY-JFR

GEOFFREY STONE, in his individual capacity,
ERIC BROWN, in his individual capacity,
FLORENCE MULHERON, in her individual capacity,
ELIJAH LANGSTON, in his individual capacity,
AARON VIGIL, in his individual capacity,

     Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS STONE AND BROWN'S MOTION FOR SUMMARY JUDGMENT

Following events at a Black Lives Matter ("BLM") protest he organized, Plaintiff Clifton White was arrested for parole violations. He argues that the arrest was pretextual and brings claims against the arresting officers, Geoffrey Stone and Eric Brown, for violations of the First Amendment (count I- retaliation for free speech) and the Fourth Amendment (count II- unreasonable seizure).[1] Doc. 1-1. Defendants Stone and Brown move for summary judgment on both claims against them based on qualified immunity. Doc. 37; *see also* Doc. 41 (response); Doc. 48 (reply). Before deciding this motion, the Court allowed Plaintiff to conduct limited discovery under Rule 56(d), after which the parties filed supplemental briefs regarding information gathered during that discovery period. Doc. 54 (Rule 56(d) Order); Doc. 66 (supplemental response); Doc. 67 (supplemental reply); Doc. 69 (supplemental surreply). The

---

[1] Count VII of Plaintiff's complaint also brought a Fourteenth Amendment conspiracy claim against Defendants Stone and Brown, Doc. 1-1 at 15, but Plaintiff has dismissed that claim, Doc. 63.

Court then held oral argument on October 14, 2023. Doc. 73. The Court now concludes that, because probable cause supported Plaintiff's arrest, Plaintiff has failed to show a constitutional violation for retaliatory arrest under the First Amendment or unreasonable seizure under the Fourth Amendment. Accordingly, the Court grants Defendants' motion for summary judgment.[2]

## UNDISPUTED MATERIAL FACT

**1.  Rules for Undisputed Material Facts**

The Court reviews both side's statement of facts with a few rules in mind. First, facts without supporting citations to the record will not be considered undisputed material facts. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."); D.N.M. LR-Civ. 56.1(b) ("The response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer *with particularity to those portions of the record upon which the non-movant relies*." (emphasis added)). In his statement of additional facts, Plaintiff includes a number of facts without citations to the record and so those facts will not be considered undisputed material facts. *See* Doc. 41 at 11-13 ¶¶ 2, 5, 16.

Second, and conversely, supported facts not specifically controverted with citations to materials in the record will be deemed undisputed. *See* Fed. R. Civ. P. 56(c)(1) ("A party

---

[2] Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), all parties consented to me serving as the presiding judge and entering final judgment. Docs. 11, 13, 14, 15, 16.

asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."); Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for the purposes of the motion."); D.N.M. LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies . . . . All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

In response to Defendants' statement of facts, Plaintiff denies a number of Defendants' supported facts but does not cite to the record or establish that Defendants' evidence fails to show the absence of a genuine factual dispute. *See* Doc. 41 at 7-9 ¶¶ 5-11, 15, 22, 25, 26. Plaintiff likewise states that he "neither admits nor denies" a number of Defendants' supported facts but does not cite to the record or establish that Defendants' evidence fails to show the absence of a genuine factual dispute. *See id.* at 7-11 ¶¶ 1, 2, 17-19, 21, 23, 24, 29-31, 37-39. The Court deems these facts undisputed.[3] *See* D.N.M. LR-Civ. 56.1(b); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 856 (10th Cir. 1999) (affirming a grant of summary judgment based on deemed-admitted facts, where the non-movants did not "comply with the requirement that they

---

[3] Indeed, in his supplemental response following Rule 56(d) discovery, Plaintiff does not amend his response to Defendants' statement of facts with citations to the record, but states that his "responses to Defendants' statement of facts remains unchanged from information learned in limited discovery." Doc. 66 at 1.

specifically controvert the defendants' fact statements with adequate and accurate record support").

Relatedly, under this Court's Local Rules, "[e]ach fact in dispute must be **numbered** . . . and must state the **number** of the movant's fact that is disputed." D.N.M. LR-Civ. 56.1(b) (emphasis in original). In the introduction to Plaintiff's response to Defendants' statement of facts, he includes narrative-style paragraphs that do not include numbered responses and, often, do not specifically state which of Defendants' facts he is disputing. Doc. 41 at 4-7. The Court will not consider this narrative in the undisputed material facts.

Third, Plaintiff generally objects to Defendants Stone and Brown's "self-serving" affidavits which they cite to support their statement of facts. Doc. 41 at 4, 6. Plaintiff argues that "[t]he actions and motives of Defendants Stone and Brown are central to this matter, and their self-serving declarations cannot be offered as 'undisputed' facts at this critical stage in the procedure." *Id.* at 4. Indeed, "conclusory and self-serving affidavits are not sufficient" to support undisputed facts in favor of summary judgment. *See Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). Instead, "affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence." *Id.* Here, Plaintiff presents no further argument to support the conclusion that Defendants' affidavits are not based on personal knowledge or do not set forth facts that would be admissible in evidence. And while the Court should disregard any affidavits that create a sham issue of fact, *see Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986), Plaintiff does not develop any such argument; he only makes the conclusory statement that the affidavits are "self-serving."

Plaintiff also argues, as to the affidavits, that "[t]he credibility of Defendants is a question of fact that must be retained for the jury." Doc. 41 at 6. The Court agrees with this statement of

the law. That is, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Thus, in reviewing the affidavits and the undisputed material facts, the Court does not make any credibility determinations but recites the supported, undisputed facts while drawing all reasonable inferences in Plaintiff's favor. However, to the extent Plaintiff is seeking to strike the affidavits entirely, the Court declines this request because Plaintiff offers no specific justification and no supporting authority to do so.

Lastly, Plaintiff argues that the Court should strike Defendants' supplemental material facts, included in their supplemental reply filed after the parties completed Rule 56(d) discovery. Doc. 69 at 2. Plaintiff argues that the local rules do not authorize such facts in a reply brief. *Id.* The Court rejects this argument because the Court already authorized Defendants' supplemental reply to include facts. The Court allowed the parties to conduct limited Rule 56(d) discovery and then to file supplemental briefs, raising any issue of facts learned during that discovery. *See* Doc. 54. Thus, just as Plaintiff had an opportunity to file a supplemental brief raising any new facts learned during discovery, Defendants are also entitled to that opportunity (to which assertion of new facts Plaintiff also had the chance to respond).

## 2.  Statement of Facts

With these rules in mind, unless stated otherwise, the following are the uncontroverted and supported material facts, taken in the light most favorable to Plaintiff:

During the summer of 2020, Defendant Geoffrey Stone was a detective with the Albuquerque Police Department ("APD") Investigative Support Unit ("ISU"). Defendants' Undisputed Material Fact ("UMF") No. 1, Doc. 37 ¶ 1 & Doc. 41 at 7 ¶ 1. At that time,

Defendant Eric Brown was a sergeant of ISU. UMF No. 2, Doc. 37 ¶ 2 & Doc. 41 at 7 ¶ 2.

Plaintiff alleges, without support, that on May 28, 2020, he and his wife, Selinda Guerrero,

organized and led a protest to call for accountability for police brutality against Black people.[4]

AMF No. 2, Doc. 41 at 11 ¶ 2 & Doc. 48 at 7 ¶ B. He further alleges, without support, that the

protest drew a significant law enforcement response. AMF No. 3 (citing Doc. 37-4 ¶ 6), Doc. 41

at 11 ¶ 3 & Doc. 48 at 7 ¶ C.[5] Defendants disagree with that characterization, but agree that on

May 28, 2020, Defendants Stone and Brown, along other ISU detectives, were assigned to

conduct surveillance of a public demonstration in order to advise APD Command staff of any

possible threats to the demonstrators or the general public. UMF No. 3, Doc. 37 ¶ 3 & Doc. 41 at

7 ¶ 3.

      The protest remained mostly peaceful throughout the night. AMF No. 3, Doc. 41 at 11

¶ 3 & Doc. 48 at 7 ¶ C. However, while conducting surveillance, Defendants Stone and Brown

observed a fight break out between several individuals and observed aerial mortars being

propelled approximately 100 feet in the air and exploding. UMF No. 4, Doc. 37 ¶ 4 & Doc. 41 at

7 ¶ 4. Defendant Brown also observed a silver Kia driving on Wisconsin Blvd and heard several

gunshots that appeared to come from the vehicle; the vehicle drove away, and then back to the

---

[4] Plaintiff also alleges, without support, that leading up to the May 28 protest, he and his spouse
were under APD surveillance related to their community organizing for BLM. Plaintiff's
Additional Material Facts ("AMF") No. 1 (citing Exhibit 2, Doc. 41-2), Doc. 41 at 11 ¶ 1. In
response to this fact, Defendants assert that the attached exhibit is inadmissible hearsay under
Fed. R. Civ. P. 56(c)(2). Doc. 48 at 7 ¶ A. The Court need not resolve this objection because,
even assuming the exhibit is admissible, it does not support Plaintiff's stated fact. The exhibit is
Plaintiff's parole violation report which states only that Plaintiff was the subject of two separate
investigations, one by New Mexico Corrections Department Security Threat Intelligence Unit on
May 19, 2020, and one by APD related to the May 28 protest, not that Plaintiff was under APD
surveillance for community organizing. Doc. 41-2.

[5] To support this allegation, Plaintiff cites Defendant Brown's affidavit, but that affidavit does
not state that the protest "drew a significant law enforcement response." Doc. 37-4.

area of Central and Wyoming where Defendant Brown heard more rounds of shots coming from the vehicle. Doc. 37-4 ¶¶ 14, 16-17 (Brown Aff.); UMF No. 4, Doc. 37 ¶ 4 & Doc. 41 at 7 ¶ 4.[6] Defendant Stone likewise heard the gunshots coming from the area of Wisconsin St. Doc. 37-1 ¶¶ 8-9 (Stone Aff.); UMF No. 4, Doc. 37 ¶ 4 & Doc. 41 at 7 ¶ 4. Defendant Stone later observed the Kia driving on Central from Wyoming after one or more of the occupants fired more shots. Doc. 37-1 ¶¶ 11 (Stone Aff.); UMF No. 4, Doc. 37 ¶ 4 & Doc. 41 at 7 ¶ 4.

After gunshots were fired from the Kia, marked units from the APD tactical team pulled the vehicle over for a felony stop. UMF No. 5, Doc. 37 ¶ 5 & Doc. 41 at 7 ¶ 5. The Kia had four occupants when APD stopped it. UMF No. 6, Doc. 37 ¶ 6 & Doc. 41 at 7 ¶ 6. The driver initially fled on foot, but eventually returned to the scene of the stop and officers took him into custody. UMF Nos. 6, 7, Doc. 37 ¶¶ 6-7 & Doc. 41 at 7 ¶¶ 6-7. Defendant Brown was present during the vehicle stop and Defendant Stone assisted the tactical officers in taking the four occupants into custody. UMF No. 8, Doc. 37 ¶ 8 & Doc. 41 at 7 ¶ 8. As officers were taking the suspects into custody, a crowd of people surrounded and enclosed the officers and the suspects, with some members of the crowd acting confrontational and hostile towards the officers including members of the crowd yelling at Defendant Stone to leave the suspects alone and another person smashing a window of an officer's vehicle. UMF Nos. 9-12, Doc. 37 ¶¶ 9-12 & Doc. 41 at 7-8 ¶¶ 9-12.

---

[6] Plaintiff "denies that it is undisputed as to whether gunshots were fired from a silver Kia Amanti," instead asserting that the occupants of the Kia were released after being detained and questioned and no charges were ever brought against them. Doc. 41 at 7 ¶ 4. To support this dispute, Plaintiff cites to a news article, which reports that the vehicle occupants denied firing shots near the protest. Doc. 41-4. Plaintiff also cites this article to support his assertion that "[d]uring the protest, APD detained four teenage boys of color in connection to alleged criminal activity connected to the vehicle they occupied." AMF No. 4, Doc. 41 at 11 ¶ 4 & Doc. 48 at 7 ¶ D. However, as Defendants point out, the statements in the article are inadmissible hearsay. *See* Fed. R. Evid. 801, 802; Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

Given the hostility of the crowd, Defendant Brown was concerned for the safety of the officers at the scene and concerned that members of the crowd were going to help the suspects escape. UMF Nos. 13-14, Doc. 37 ¶¶ 13-14 & Doc. 41 at 8 ¶¶ 13-14. Defendant Brown thus contacted APD command staff and requested that the APD Emergency Response Team be sent to assist in securing the scene. UMF No. 14, Doc. 37 ¶ 14 & Doc. 41 at 8 ¶ 14.[7] Due to the crowd, APD Command staff decided to withdraw all officers and detectives from the stop, leaving the silver Kia and all evidence in place. UMF No. 15, Doc. 37 ¶ 15 & Doc. 41 at 8 ¶ 15. APD then used an armored vehicle to transport the suspects to a secure location and all tactical officers and ISU detectives left the scene. UMF Nos. 16-17, Doc. 37 ¶¶ 16-17 & Doc. 41 at 8 ¶¶ 16-17. Plaintiff alleges, without support, that in detaining the vehicle occupants, Defendant Stone left the vehicle unsecured, unlocked, and with the keys on the roof of the car. Doc. 41 at 8 ¶ 15; AMF No. 5, Doc. 41 at 11 ¶ 5 & Doc. 48 at 7 ¶ B.

Sometime after the officers and suspects left the scene of the stop, APD Air Support reported over the APD radio communications that they observed an unknown individual entering the Kia and driving it away from the scene of the stop. UMF No. 18, Doc. 37 ¶ 18 & Doc. 41 at 8 ¶ 18. The unknown individual drove the Kia to the area of 407 Wellesley, exited the car and walked over to another unknown vehicle, then reentered the Kia and drove it until marked APD patrol units stopped it. UMF Nos. 19-20, Doc. 37 ¶¶ 19-20 & Doc. 41 at 8 ¶¶ 19-20. For his part, Plaintiff alleges, without support, that, after observing the vehicle left unsecured by APD, he

---

[7] Plaintiff denies UMF Nos. 12, 13, and 14 without citations to the record or a showing that the materials cited by Defendants do not establish the absence of a genuine dispute. Doc. 41 at 8 ¶¶ 12-14.

secured the vehicle at his residence. AMF No. 6 (citing Doc. 41-5), Doc. 41 at 11 ¶ 6 & Doc. 48 at 7 ¶ E.[8]

Neither Defendant Stone nor Defendant Brown were on the scene when officers detained "the driver", but Defendant Stone later learned, after reviewing a report written by Officer Elliott Padilla, that the driver was identified as Plaintiff Clifton White. UMF Nos. 21-22, Doc. 37 ¶¶ 21-22 & Doc. 41 at 8-9 ¶¶ 21-22. According to Officer Padilla's report, the owner of the Kia could not be reached to establish whether he had given Plaintiff permission to drive the vehicle, so Plaintiff was released from police custody. UMF No. 23, Doc. 37 ¶ 23 & Doc. 41 at 9 ¶ 23. Indeed, the owner of the vehicle later stated that Plaintiff did not steal his vehicle and that he supported Plaintiff's actions of securing his vehicle from theft. Doc. 41-6 (Aff. of vehicle owner); AMF No. 7, Doc. 41 at 11-12 ¶ 7 & Doc. 48 at 8 ¶ F.

Defendant Stone was assigned to conduct a follow-up investigation regarding the shooting from the Kia and Plaintiff's actions in driving the Kia away from the scene. UMF No. 24, Doc. 37 ¶ 24 & Doc. 41 at 9 ¶ 24; AMF No. 8, Doc. 41 at 12 ¶ 8 & Doc. 48 at 8 ¶ G. Defendant Stone procured a warrant to search the Kia for any physical evidence that the occupants were firing a weapon from the vehicle, but during the search he found that the vehicle was very clean and he did not locate any firearms or casings in the vehicle. UMF Nos. 25-26, Doc. 37 ¶¶ 25-26 & Doc. 41 at 9 ¶¶ 25-26.[9] On June 1, Defendant Stone contacted the owner of

---

[8] To support this assertion, Plaintiff attaches a portion of the transcript from his parole hearing. Doc. 41-5. Defendants object to the exhibit as inadmissible hearsay, Doc. 48 at 7 ¶ E. The Court need not resolve this issue because, even assuming the transcript is admissible, it does not support Plaintiff's factual allegation as the transcript says nothing about Plaintiff deciding to secure the vehicle at his residence.

[9] Plaintiff, without any supporting citation to the record, denies Defendant Stone's statement that the vehicle was very clean. Doc. 41 at 9 ¶ 23. Specifically, Plaintiff denies that assertion "because it includes inferences, without any support, that Mr. White was an intervening factor in

the Kia; the owner informed Defendant Stone that he did not know Plaintiff but he did not wish to press charges against Plaintiff for driving the vehicle without permission. UMF No. 27, Doc. 37 ¶ 27 & Doc. 41 at 9 ¶ 27. Defendant Stone, therefore, did not seek an arrest warrant to charge Plaintiff with the unlawful taking of a motor vehicle. UMF No. 28, Doc. 37 ¶ 28 & Doc. 41 at 9 ¶ 28.

That same day (June 1), however, Defendant Stone conferred with the Second Judicial District Attorney's Office about drafting a criminal complaint for an arrest warrant charging Plaintiff with tampering with evidence. UMF No. 29, Doc. 37 ¶ 29 & Doc. 41 at 9 ¶ 29. Around 12:30 p.m., as Defendant Stone was preparing to the draft the criminal complaint, his supervisors informed him that Plaintiff was on parole and that the New Mexico Department of Probation and Parole was going to issue an Arrest Order for Plaintiff for a parole violation.[10] UMF No. 30, Doc. 37 ¶ 30 & Doc. 41 at 10 ¶ 30. Defendant Stone then contacted Parole Officer Elijah Langston and asked for a copy of the parole violation Arrest Order.[11] UMF No. 31, Doc. 37 ¶ 31 & Doc. 41 at 10 ¶ 31. As he was awaiting a copy of the parole violation Arrest Order, Defendant

---

the purported 'very clean' condition of the silver Kia." *Id.* The Court takes this fact for what it states—that upon searching the vehicle, Defendant Stone found it to be very clean—without drawing any inferences against Plaintiff.

[10] Defendants explain that law enforcement uses the National Crime Information Center ("NCIC") database to track warrants and probation and parole records. Defendants' Supplemental Material Fact ("Supp. MF") No. A, Doc. 67 at 2 ¶ C & Doc. 69 at 2 ¶ A. Although they provide no further information regarding the use of NCIC, the Court assumes they include this information in order to imply that Defendant Stone's supervisors learned that Mr. Langston was Plaintiff's parole officer from NCIC. As Plaintiff points out, however, there is no evidence in the record that law enforcement in this case actually used NCIC to get Mr. Langston's information; Mr. Langston merely speculated as much during his deposition. *See* Doc. 67-1 at 17:25 to 18:11. The Court, thus, draws no implication that APD supervisors learned information from NCIC.

[11] Elijah Langston was originally a defendant in this case, Doc. 1-1, but Plaintiff has since dismissed him from the case, Doc. 33.

Stone finished drafting the criminal complaint charging Plaintiff with tampering with evidence and emailed his draft to the Deputy District Attorney at 1:17 p.m. UMF No. 32, Doc. 37 ¶ 32 & Doc. 41 at 10 ¶ 32; AMF No. 9, Doc. 41 at 12 ¶ 9 & Doc. 48 at 8-9 ¶ H. At 1:23 p.m., Defendant Stone received an email from Mr. Langston with the parole violation Arrest Order attached.[12] UMF No. 33, Doc. 37 ¶ 33 & Doc. 41 at 10 ¶ 33; Doc. 37-2. At 2:50 p.m., Defendant Stone received an email from the Deputy District Attorney informing him that Plaintiff could not be charged with tampering with evidence because there was no evidence showing that Plaintiff knew the Kia was used in the commission of a crime. UMF Nos. 34-35, Doc. 37 ¶¶ 34-35 & Doc. 41 at 10 ¶¶ 34-35; AMF No. 9, Doc. 41 at 12 ¶ 9 & Doc. 48 at 8-9 ¶ H. Defendant Stone informed his supervisors, including Defendant Brown, that the District Attorney's Office would not approve the criminal complaint for tampering with evidence. UMF No. 36, Doc. 37 ¶ 36 & Doc. 41 at 10 ¶ 36.

As to the Arrest Order, Mr. Langston explained in his deposition that, prior to May 28, 2020, he had Plaintiff under investigation based on information he received from the Security Threat Intelligence Unit. Supp. MF No. C, Doc. 67 at 3 ¶ E & Doc. 69 at 3 ¶ C. Indeed, a parole violation report from August 14, 2020, further explains that on May 19, 2020 (9 days before the BLM protest), New Mexico Corrections Department ("NMCD") Security Threat Intelligence Unit contacted Probation and Parole to inform them that, during an investigation into recent protests at two NMCD facilities, they identified Plaintiff as present during the rallies and as

---

[12] Plaintiff alleges, without support, that Defendant Stone was the one who procured the parole violation Arrest Order. AMF No. 12, Doc. 41 at 12 ¶ 12 & Doc. 48 at 9 ¶ J. But the Arrest Order that Plaintiff cites in support makes no mention of Defendant Stone and has signature lines only for Elijah Langston and Edmund Vigil of Probation and Parole. Doc. 41-3.

having telephone contact with inmates. Doc. 41-2 (parole violation report);[13] *see also* Doc. 67-1 at 12:1 to 13:3 (Langston depo.). The rallies took place outside Bernalillo county, and, even though one of Plaintiff's conditions of parole prohibited him from traveling outside Bernalillo county without permission, Plaintiff had not requested permission to travel outside the county. Doc. 41-2; Doc. 67-1 at 13:9-18.

Following the May 28 protest, Mr. Langston received a police report and requested lapel video footage from APD regarding Plaintiff and the Kia. Supp. MF No. D, Doc. 67 at 3 ¶ F & Doc. 69 at 3 ¶ D; *see also* Doc. 67-1 at 17:15-24, 22:5-14 (Langston depo.). Mr. Langston testified that he generally expects that he will "get a phone call" when an APD officer has contact with a parolee under his supervision. Doc. 67-1 at 18:24 to 19:3 (Langston depo.); Supp. MF No. B, Doc. 67 at 2 ¶ D & Doc. 69 at 2-3 ¶ B. The police report concerned Mr. Langston because, in part, it indicated that Plaintiff had been out past curfew. Doc. 67-1 at 21:20 to 22:2 (Langston depo.). Mr. Langston also watched a Facebook video, which he describes as showing Plaintiff engaging in aggressive behavior, including berating an officer.[14] Doc. 67-1 at 28:18 to

---

[13] Defendants object to Exhibit 2 (the parole violation report, Doc. 41-2) as inadmissible hearsay. Doc. 48 at 7 ¶ A. To the extent the parole violation report is offered to explain why Plaintiff's Parole Officer issued an Arrest Order for parole violations, it is not offered for the truth of the matter asserted and, therefore, is not hearsay. Whether the contents of the report are true or not, its existence provides evidence of a factor motivating Mr. Langston's actions. The contents of the report—that Plaintiff was indeed present at these rallies and committed the alleged violations—are, however, inadmissible hearsay. *See* Fed. R. Evid. 801(c), 802.

[14] Plaintiff asserts that "[a]s part of [APD's communication with Probation and Parole], APD provided video of the protest to Probation and Parole." AMF No. 11 (citing Exhibit 8, Doc. 41-8), Doc. 41 at 12 ¶ 11 & Doc. 48 at 9 ¶ I. Defendants correctly argue that the exhibit Plaintiff cites does not support this assertion. Exhibit 8 (Doc. 41-8) is an email from Koury Church to Edmund Vigil, Probation/Parole Supervisor, on June 2, 2020 with a link to a Facebook video posted by Plaintiff's wife, Selinda Guerrero. It is not clear from the email what the video is or who Koury Church is. Mr. Langston did testify at his deposition that he watched a video from a Facebook post by Selinda Guerrero, but did not specify who provided the video to him or who

29:3 (Langston depo.); Supp. MF No. G, Doc. 67 at 3 ¶ I & Doc. 69 at 3 ¶ G. Mr. Langston took

the police report to his supervisor and they decided to issue a warrant for Plaintiff's arrest. Supp.

MF No. E, Doc. 67 at 3 ¶ G & Doc. 69 at 3 ¶ E; *see also* Doc. 67-1 at 19:4-13 (Langston depo.).

Mr. Langston was aware that the District Attorney's Office had not approved a warrant for

Plaintiff's arrest, but based on the police report and lapel video, he had reason to believe that

Plaintiff violated conditions of his parole, such as a curfew violation. Supp. MF No. F, Doc. 67

at 3 ¶ H & Doc. 69 at 3 ¶ F.

 The Arrest Order lists the following parole violations: (1) "Conduct: Offender has had

multiple negative contacts with Albuquerque PD in which he has been verbally combative, and

failed to identify himself, as well as failed to follow lawful orders"; "Behavior: Offender has

failed to report to APPO [Parole Officer] by curfew, failed to report police contact and was

recently a suspect in a[n] auto theft"; "Association: Offender has been recorded contacting

inmates at CNMCF by telephone . . . . Offender has failed to adhere to ISP conditions, including

reporting and curfew." Doc. 41-3 & Doc. 37-3 (Arrest Order); AMF No. 13, Doc. 41 at 12 ¶ 13

& Doc. 48 at 9 ¶ K.

 After issuing the Arrest Order, Mr. Langston reached out to Defendant Stone, who

advised Mr. Langston that APD was surveilling Plaintiff "at that particular moment [on June

1]",[15] so Mr. Langston forwarded the arrest warrant to Defendant Stone. Doc. 67-1 at 30:23 to

---

informed him of the video. Doc. 67-1 at 28:18 to 29:3. And neither party provided the video
itself to the Court.

[15] Plaintiff alleges that Mr. Langston was aware that APD was surveilling Plaintiff and that Mr.
Langston concluded that Defendant Stone's motivation for surveilling Mr. White was due to Mr.
White's protest activity. Plaintiff's Supplemental Material Fact ("Supp. MF") No. 1, Doc. 66 at
1-2 ¶ 1 & Doc. 67 at 1 ¶ A; *see also* Doc. 66 at 3-4. To support this fact, Plaintiff cites Mr.
Langston's deposition. Doc. 66-1. In his deposition, however, Plaintiff's counsel asks, "And
you're also testifying here today that APD never told you the reason why they had Mr. White

31:12 (Langston depo.); Supp. MF No. H, Doc. 67 at 3 ¶ J & Doc. 69 at 3 ¶ H. Because

Probation and Parole issued an Arrest Order for Plaintiff's arrest, APD Commander Mizel Garcia

and the lieutenant over the ISU unit directed ISU detectives to assist Probation and Parole by

arresting Plaintiff on the Order. UMF No. 37, Doc. 37 ¶ 37 & Doc. 41 at 10 ¶ 37. In his

deposition, Mr. Langston testified that, during his tenure as a parole officer, it was common

practice for Probation and Parole to work with APD on parole investigations and that APD

assisted Probation and Parole on things such as investigating parolees or probationers suspected

of a new crime and transporting and booking individuals.[16] Doc. 66-5 at 15:16 to 16:21; *see also*

Supp. MF No. 2, Doc. 66 at 2 ¶ 2 & Doc. 67 at 2 ¶ B.

On June 1, ISU detectives went to Plaintiff's residence to take him into custody and,

around 6:00 p.m., they observed Plaintiff leaving his residence and followed him. UMF Nos. 38-

39, Doc. 37 ¶¶ 38-39 & Doc. 41 at 10-11 ¶¶ 38-39. ISU detectives followed Plaintiff as he drove

---

under surveillance after the protest on May 28th, into the morning of May 29th?" Doc. 66-1 at
37:19-33. Mr. Langston responded, "That information was not directly given to me, no." *Id.* at
37:23. Plaintiff's attorney also asked, "did you ever become aware of the reasons why they had
Mr. White under investigation?" *Id.* at 38:1-2. Mr. Langston replied, "No, I was not. Again, I
could—I could assume it's because of the—the contacts they had had with him prior, but I can't
confirm that, no." *Id.* at 38:3-5. Although Mr. Langston testified earlier in his deposition that
when he spoke to Defendant Stone *on June 1*, Defendant Stone advised him that "*at that
particular moment* for reasons I'm assuming for their investigation" that "they were surveilling
Mr. White," the testimony Plaintiff cites does not demonstrate that Mr. Langston had first-hand
knowledge about any pre-June 1 surveillance or investigation. Doc. 67-1 at 31:7-9 (emphasis
added). At best, it supports a conclusion that, if there was pre-June 1 APD surveillance or an
APD investigation, Mr. Langston assumed that it related to unspecified prior contacts
unidentified APD officers had with Plaintiff.

[16] Although Plaintiff acknowledges that Mr. Langston testified that Probation and Parole
routinely collaborates with law enforcement agencies regarding parolees, Plaintiff asserts that
"such collaboration primary occur[s] when parolees are suspected of engaging in serious crime."
Doc. 66 at 4 (citing Doc. 66-5 at 15:16 to 16:21). Mr. Langston, however, never testified about
"serious crime." Instead, he testified that collaboration typically occurs when parolees are
suspected of a new crime and consists of clerical duties and transport. Doc. 66-5 at 15:16 to
16:21.

to the Bird Liquor Store where Defendants Brown and Stone took him into custody. UMF No.
40, Doc. 37 ¶ 40 & Doc. 41 at 11 ¶ 40. Plaintiff alleges, without support, that APD's motive in
surveilling and eventually arresting him was retaliatory and pretextual "made clear by the fact
that they continued changing the basis for his arrest, failed to obtain an arrest warrant, and
encouraged prosecuting the violation related to his protest activity." AMF No. 14 (citing Exhibit
8, Doc. 41-8), Doc. 41 at 12 ¶ 14 & Doc. 48 at 9 ¶ L. The exhibit Plaintiff cites in support is an
email between Edmund Vigil and Koury Church that simply lists an attached Facebook video
and in no way supports Plaintiff's factual allegation.[17] Doc. 41-8.

## LEGAL STANDARD

Qualified immunity protects public officials from liability "insofar as their conduct does
not violate clearly established statutory or constitutional rights of which a reasonable person
would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.
Fitzgerald*, 457 U.S. 800, 818 (1982)). When an individual defendant raises the qualified
immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-
part test. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The plaintiff must show that
1) the officer violated a constitutional or statutory right and 2) the right was clearly established
when the alleged violation occurred. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir.
2002); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "If, and only if, the plaintiff
meets this two-part test does a defendant then bear the traditional burden of the movant for

---

[17] Plaintiff likewise alleges, without support, that parole hearing officer Florence Mulheron
"expressed criticism about the fact that many of the alleged violations, including APD's
allegations about Mr. White's protest at a New Mexico Corrections Department facility[,] failed
to follow procedures and were too old to prosecute." AMF No. 15 (citing Exhibit 9, Doc. 41-9),
Doc. 41 at 13 ¶ 15 & Doc. 48 at 10 ¶ M. The exhibit Plaintiff cites, an email between Mulheron
and Langston, in no way supports this allegation. Doc. 41-9.

summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018) (internal quotation marks and citations omitted). A court may address these prongs in either order, *Pearson*, 555 U.S. at 236, but a plaintiff must satisfy both to avoid qualified immunity, *Olsen*, 312 F.3d at 1304.

In determining whether an officer is entitled to qualified immunity, the relevant question is not whether the officer made a mistake or whether, in retrospect, the officer should have acted differently. "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful— should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Instead, the relevant inquiry is whether an officer had clear notice that the specific conduct in which the officer engaged was illegal.

A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S.at 640. The action at issue need not have been previously declared unlawful, but its unlawfulness must be evident in light of preexisting law. *Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005). Except for egregious circumstances in which every reasonable officer would understand the conduct at issue to be unreasonable, unlawfulness is generally demonstrated "when there is controlling authority on point or when the clearly established weight of authority from other courts supports plaintiff's interpretation of the law." *Id.* at 1069-70 (internal quotation marks omitted). "A prior case need not have identical facts," *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017), but the precedent must make it clear "to every reasonable officer . . . that what

he is doing violates that right," *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks

omitted). The plaintiff bears the burden of identifying "a controlling case or robust consensus of

cases" where an officer acting "under similar circumstances" to those faced by the defendants

was found to have acted unlawfully. *D.C. v. Wesby*, 538 U.S. 48, 65 (2018); *Quinn v. Young*, 780

F.3d 998, 1013 (10th Cir. 2015). Furthermore, the cases so cited must clearly establish that "the

scope of the right encompasses the facts presented." *Quinn*, 780 F.3d at 1012 (internal quotation

marks omitted; emphasis removed).

In recent years, the Supreme Court "has issued a number of opinions reversing federal

courts in qualified immunity cases." *White v. Pauly*, 580 U.S. 73, 79 (2017). "The Court has

found this necessary both because qualified immunity is important to society as a whole, and

because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously

permitted to go to trial." *Id.* (internal quotation marks and citations omitted). "[T]he defense of

qualified immunity gives public officials the benefit of legal doubts." *Donovan v. City of

Milwaukee*, 17 F.3d 944, 951 (7th Cir. 1994) (internal quotation marks omitted). Thus, qualified

immunity provides "ample room for mistaken judgments" and protects all but "the plainly

incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 314, 343

(1986).

## DISCUSSION

Plaintiff's allegations against Defendants Stone and Brown are twofold: (1) that

Defendants violated his First Amendment right when they retaliated against him for his free

speech protest activities by unlawfully investigating and arresting him for technical parole

violations; and (2) that Defendants violated his Fourth Amendment right when they conducted an

unreasonable seizure and detained him even though they had no reasonable suspicion that he

committed a crime and no authority to enforce technical parole violations. Doc. 1-1 at 12-13. The First Amendment claim, in essence, is two distinct claims: retaliatory investigation and retaliatory arrest, while the Fourth Amendment claim relates only to the arrest. The Court will thus address the First and Fourth Amendment arrest claims first and then turn to the First Amendment retaliatory investigation claim.

### 1. Retaliatory/Unreasonable Arrest

The Court begins its analysis of Plaintiff's claim for unlawful arrest in violation of the First and Fourth Amendments by defining exactly what actions are at issue. The undisputed material facts establish that, following the May 28 protest, Defendant Stone was assigned to conduct a follow-up investigation regarding the Kia and Plaintiff driving the Kia away from the protest. UMF No. 24. Defendants Stone and Brown were not involved in detaining Plaintiff on May 28 as he drove the Kia away from the protest. UMF No. 21. Instead, Defendants Stone and Brown arrested Plaintiff on the parole violation Arrest Order on June 1. UMF No. 40. Because Defendants arrested Plaintiff based on an Arrest Order supported by probable cause and because Plaintiff fails to show that the narrow exception discussed in *Nieves v. Bartlett* applies, the Court finds no constitutional violation as to Plaintiff's arrest.

  a. Defendants' arrest of Plaintiff for parole violations was supported by probable cause.

A First Amendment retaliatory arrest claim requires the threshold showing that there was a false arrest—i.e., that the arrest lacked probable cause. *Hinkle v. Beckham Cnty. Bd. of Cnty. Commissioners*, 962 F.3d 1204, 1226 (10th Cir. 2020); *see also Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019) ("The plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest."). Relatedly, the general rule for Fourth Amendment claims is "that Fourth Amendment seizures are reasonable only if based on probable cause to

believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192
(2013) (internal quotation marks and citations omitted).

Before discussing whether probable cause existed, however, the Court discusses whether,
in a case like this where the arrest is for parole violations as opposed to a new crime, something
less than probable cause can support the arrest. Defendants argue that Plaintiff's status as a
parolee does not afford him the same protections as someone not on parole. That is, Defendants
argue that "since Plaintiff, as a parolee, was already in the legal custody of the New Mexico
Department of Correction no constitutional deprivation occurred since City Defendants only took
physical custody of [Plaintiff] by virtue of the Arrest Order to return him to the Department [of
Corrections]." Doc. 37 at 10.

Defendants correctly point out that the Tenth Circuit has held that parolees remain in
"constructive custody"—indicating that the rights of parolees are not "coextensive with those of
ordinary citizens." *Jenkins v. Currier*, 514 F.3d 1030, 1033 (10th Cir. 2008) (internal quotation
marks and citations omitted); *see also United States v. Lewis*, 71 F.3d 358, 361 (10th Cir. 1995)
(explaining that the Fourth Amendment's protections of parolees are more limited, which limits
their expectation of privacy and establishes a different warrantless-search analysis than for a free
citizen); *United States v. Polito*, 583 F.2d 48, 54 (2d Cir. 1978) (explaining that "case law
indicates that parolees are neither totally stripped of nor fully invested with constitutional
protections," but that retaking a parolee is not the same as an arrest for constitutional purposes);
*Neilsen v. McElderry*, No. 18cv1538, 2019 WL 3712029, at *11 (D. Colo. Aug. 7, 2019)
("Whether Plaintiff was a parolee or an incarcerated prisoner is irrelevant to the situation at hand.
The Court agrees with Defendant and is persuaded by the line of cases holding that the retaking
of either a parolee or convicted inmate does not constitute an arrest for Fourth Amendment

purposes."), *aff'd*, 823 F. App'x 575 (10th Cir. 2020); NMSA § 31-21-10(E) ("Every person while on parole shall remain in the legal custody of the institution from which the person was released."). Even so, to the extent Defendants are arguing that Plaintiff's status as a parolee means he sheds all constitutional rights, the Court rejects this argument. Indeed, at oral argument, Defendants agreed that arresting a parolee for no reason other than his race would be a constitutional violation. Instead of arguing that a parolee legally can be taken into physical custody in retaliation for the exercise of a constitutional right, Defendants appear to be arguing that no constitutional protections attach to retaking a parolee who commits parole violations into physical custody.

Plaintiff, for his part, argues that, even for parolees, officers need at least reasonable suspicion to justify an arrest. Doc. 41 at 14. The New Mexico cases he cites, however, deal with warrantless searches of a probationer's property, not seizures supported by an arrest order. *See State v. Baca*, 2004-NMCA-049, ¶ 43, 90 P.3d 509, 522 ("[W]e hold that warrantless probation searches can and must be supported by reasonable suspicion as defined in New Mexico law to be an awareness of specific articulable facts, judged objectively, that would lead a reasonable person to believe criminal activity occurred or was occurring."); *State v. Bolin*, 2010-NMCA-066, ¶ 13, 238 P.3d 363, 366 ("A probationer's rights in this regard are more limited than those of other citizens and our courts have held that probation officers may constitutionally search a probationer's home without a warrant when they possess reasonable cause to believe a probation violation has occurred") (internal citation omitted).

Ultimately, however, the Court need not resolve what constitutional standard, if any, applies to arresting a parolee for parole violations. The standard Plaintiff proposes, reasonable suspicion, is an easier standard to meet than probable cause. *See Illinois v. Wardlow*, 528 U.S.

20

119, 119 (2000) ("[R]easonable suspicion is a less demanding standard than probable cause."). And here, even applying the more difficult standard, probable cause, the Court finds that probable cause supported Plaintiff's arrest for parole violations.

As mentioned above, a showing of probable cause to arrest will generally defeat both a First Amendment retaliatory arrest claim and a Fourth Amendment unreasonable seizure claim. "In reviewing 'whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *Hinkle v. Beckham Cnty. Bd. of Cnty. Commissioners*, 962 F.3d 1204, 1220 (10th Cir. 2020) (quoting *District of Columbia v. Wesby*, 538 U.S. 48, 56-57 (2018)). "Such facts amount to probable cause when they are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id.* (cleaned up).

The Arrest Order lists the following parole violations: (1) "Conduct: Offender has had multiple negative contacts with Albuquerque PD in which he has been verbally combative, and failed to identify himself, as well as failed to follow lawful order"; "Behavior: Offender has failed to report to APPO [Parole Officer] by curfew, failed to report police contact and was recently a suspect in a[n] auto theft"; "Association: Offender has been recorded contacting inmates at CNMCF by telephone . . . . Offender has failed to adhere to ISP conditions, including reporting and curfew." Doc. 41-3 & Doc. 37-3. Even disregarding alleged parole violations related to speech at the May 28 protest—i.e., verbally combative encounters with APD—the undisputed material facts support at least a parole violation for breaking curfew. *See* Doc. 67-1 at 21:20 to 22:2 (Langston depo.). Indeed, Plaintiff does not dispute the parole violations, but instead downplays them as "technical parole violations." Doc. 41 at 2. Thus, the undisputed

material facts demonstrate that at least probable cause existed to support a parole violation on

which Plaintiff's parole officer, Mr. Langston, predicated the Arrest Order.

Defendants then took Plaintiff into custody based on the Arrest Order that Probation and

Parole issue and sent them. UMF Nos. 33, 37; Supp. MF No. H. Nothing in the record indicates

that Defendants would have a reason to question the validity of the Arrest Order.[18] Indeed,

"courts have held that police officers may ordinarily rely on determinations made by other

officers regarding the constitutional legitimacy of police procedures." *Marshall v. Columbia Lea

Reg'l Hosp.*, 345 F.3d 1157, 1179-80 (10th Cir. 2003). "In *Whiteley v. Warden,* 401 U.S. 560,

568 (1971), the Supreme Court noted that 'police officers called upon to aid other officers in

executing arrest warrants are entitled to assume that the officers requesting aid [had properly

determined the existence of] probable cause.'" *Id.*

Plaintiff argues that "under no circumstances should cooperation between law

enforcement officers and probation officers be permitted to make the probation system 'a

subterfuge for criminal investigations.'"[19] Doc. 41 at 14 (quoting *State v. Gardner*, 1980-

---

[18] Defendants also argue that they "had probable cause independent of the Arrest Order as they
had information within their knowledge that Plaintiff had committed the crimes of Unlawful
Taking of a Motor Vehicle and/or Injuring or Tampering with a Motor Vehicle since Plaintiff
drove off in the Kia without permission from the owner." Doc. 37 at 12 (citing NMSA § 30-16D-
1(A) & NMSA § 30-16D-5(A)(1)). However, before arresting Plaintiff on June 1, Defendant
Stone had already decided not to seek an arrest warrant charging Plaintiff with unlawful taking
of a motor vehicle because the owner of the vehicle was unwilling to prosecute. UMF Nos. 27,
28. Thus, it is not clear that, by June 1, Defendants had arguable probable cause to arrest Plaintiff
for taking the Kia. Similarly, it is not clear from the record that Defendants had arguable
probable cause to arrest Plaintiff for injuring or tampering with a motor vehicle. Lack of arguable
probable cause to arrest Plaintiff for taking or tampering with the Kia, however, would
not change the Court's conclusion that Defendants had probable cause to arrest Plaintiff on the
parole violation Arrest Order.

[19] Recognizing that "Plaintiff is alleging that Defendants knowingly conspired with the parole
officer to arrest Plaintiff in retaliation for Plaintiff's protected activities[,]" the Court allowed
Plaintiff to conduct Rule 56(d) discovery on the topic of whether Defendants influenced the

NMCA-122, ¶ 26, 619 P.2d 847, 851). The most significant problem with Plaintiff's theory is that it appears to be more in line with a retaliatory prosecution claim (which Plaintiff did not bring) than a retaliatory arrest claim (which Plaintiff did bring). The Supreme Court addressed a retaliatory prosecution claim in *Hartman v. Moore*, 547 U.S. 250 (2006). There, after being acquitted on federal fraud charges, Michal Hartman sued, for retaliatory prosecution, the postal inspector who had investigated him. *Id*. at 253-54. Specifically, he claimed "that the prosecutor and the inspectors had engineered his criminal prosecution in retaliation for criticism of the Postal Service . . ., that the inspectors targeted him for his lobbying activities, and that they pressured the United States Attorney's Office to have him indicted." *Id*. at 254.[20] The Supreme Court explained that in a retaliatory prosecution claim "the defendant will be a nonprosecutor, an official, like an inspector here, who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute. The consequence is that a plaintiff . . . must show that the nonprosecuting official acted in retaliation, and must also show that he induced the prosecutor to bring charges that would not have been initiated without his urging." *Id*. at 262.

This description of a retaliatory prosecution claim is more in line with Plaintiff's theory than a retaliatory arrest claim, which does not involve inducing another to bring charges. That is, consistent with the Supreme Court's description of a retaliatory prosecution cause of action,

---

parole officer's decision to issue an arrest order. Doc. 54 at 9. The Court reasoned, if Defendants had done so, that could undermine their argument that they could reasonably rely on the probable cause determination of other law enforcement officers. *See* Doc. 54 at 6.

[20] Because the investigator in *Hartman* was a federal agent, *Hartman* involved a *Bivens* claim rather than a § 1983 claim. 547 U.S. at 252. The rationale that supports the Supreme Court's holding, however, applies equally to a § 1983 claim. *See id*. at 261-62 ("*Bivens* (or § 1983) action for retaliatory prosecution will not be brought against the prosecutor, who is absolutely immune from liability for the decision to prosecute.").

Plaintiff is alleging that, in retaliation for Plaintiff's constitutionally protected speech, Defendants (nonprosecuting officials) induced another (a parole officer who had the power to issue an arrest order) to bring charges that would not have been initiated without Defendants' urging. Plaintiff, however, does not allege retaliatory prosecution in his complaint. *See* Doc. 1-1 at 12. The omission of this claim from Plaintiff's complaint raises multiple questions: Should Plaintiff be allowed to amend his complaint to add a retaliatory prosecution claim? And is a probation officer who issues an arrest order the equivalent of a prosecutor for such a claim? These questions are not briefed. The Court need not answer them, however, because even if both questions were answered in the affirmative, Plaintiff still could not prevail under a retaliatory prosecution claim.

That is because *Hartman* rejected the approach used in employment discrimination cases, such as in *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274 (1977), which "have simply taken the evidence of the motive and the discharge as sufficient for a circumstantial demonstration that the one caused the other." *Hartman*, 547 U.S. at 260. Instead, where a criminal prosecution is supported by probable cause, the Supreme Court does not afford a plaintiff the opportunity to prove that retaliatory animus motivated the investigator to influence the prosecutor to bring charges. *Id*. at 265-66 ("Because showing an absence of probable cause will have high probative force, and can be made mandatory with little or no added cost, it makes sense to require such a showing as an element of a plaintiff's case, and we hold that it must be pleaded and proven."). Retaliatory prosecution claims, the Supreme Court reasoned, are different than retaliatory discharge claims owed to "the factual difficulty of divining the influence of an investigator or other law enforcement officer upon the prosecutor's mind [and the] added legal obstacle in the longstanding presumption of regularity accorded to prosecutorial

decisionmaking." *Id*. at 263. In short, where probable cause supports a criminal charge, a criminal defendant has no viable retaliatory prosecution claim—period. Because probable cause supports the Arrest Order in the present case (Plaintiff was indisputably out past curfew without authorization) any retaliatory prosecution claim he might bring would fail.

Thirteen years after deciding *Hartman*, the Supreme Court extended its reasoning to retaliatory arrest claims. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019) ("Adopting *Hartman*'s no-probable-cause rule in this closely related context addresses those familiar concerns."). In concluding that a plaintiff must demonstrate the absence of probable cause to support such a claim the Supreme Court set forth numerous concerns with an alternative standard that would consider the subjective intent of the arresting officer. Such an alternative subjective standard, the Supreme Court reasoned, would fail to recognize: that "protected speech is often a legitimate consideration when deciding to make an arrest"; that there is a "complexity of proving (or disproving) causation in retaliatory arrest cases"; the difficulty of demonstrating an officer's subjective intent given that "state of mind is easy to allege and hard to disprove"; that "a subjective inquiry would threaten to set off broad-ranging discovery in which there often is no clear end to the relevant evidence"; the creation of "overwhelming litigation risks" where "[a]ny inartful turn of phrase or perceived slight during a legitimate arrest could land an officer in years of litigation"; and an attendant risk "that officers would simply minimize their communication during arrests to avoid having their words scrutinized for hints of improper motive—a result that would leave everyone worse off." *Id*. at 1725. Particularly relevant to the present case, the Supreme Court concluded that placing an officer's state of mind at issue even where probable cause supports an arrest would make "policing certain events like an unruly protest [subject to] overwhelming litigation risks." *Id*. Thus, as in *Hartman*, the Supreme Court in *Nieves* rejected

the *Mt. Healthy* approach of considering whether retaliation was a substantial or motivating factor behind the arrest. *Id*. (holding such consideration only comes into play when an arrest is not supported by probable cause). Instead, as in *Hartman*, the Supreme Court adopted a clear-cut rule that a plaintiff pressing a retaliatory arrest claim must show a lack of probable cause. *Id*.

As set forth above, Plaintiff does not dispute that a parole officer issued an Arrest Order based, at least in part, on Plaintiff's undisputed curfew violation. As a result, even if Plaintiff had alleged facts consistent with a retaliatory arrest claim, whether retaliation was a substantial or motivating factor behind Plaintiff's arrest would not factor into the Court's analysis. Except for the narrow exception discussed below, when probable cause exists, the motivation of the arresting officers does not matter. Doc. 41 at 15.[21] Because at least probable cause supported the Arrest Order Defendants Stone and Brown executed, Plaintiff's claims for retaliatory arrest under the First Amendment and for unreasonable seizure under the Fourth Amendment fail.[22]

---

[21] Plaintiff, in essence, is making an intent argument in line with Justice Sotomayor's dissent in *Nieves*. Justice Sotomayor, relying on *Mt. Healthy*, suggests that a plaintiff pressing a retaliatory arrest claim must "first establish that constitutionally protected conduct was a 'substantial' or 'motivating' factor in the challenged governmental action (here, an arrest). If the plaintiff can make that threshold showing, the question becomes whether the governmental actor (here, the arresting officer) can show that the same decision would have been made regardless of the protected conduct." *Nieves*, 139 S. Ct. at 1736 (Sotomayor, J., dissenting) (quoting *Mt. Healthy*, 429 U.S. at 287). The majority of the Court, however, rejected this approach in favor of a clear-cut rule that a plaintiff pressing a retaliatory arrest claim must show a lack of probable cause. *See Nieves*, 139 S. Ct. at 1725 ("[I]f the plaintiff establishes the absence of probable cause, then the *Mt. Healthy* test governs.").

[22] Defendants also argue that, as to Plaintiff's First Amendment claim, he was not engaged in constitutionally protected activity since he was on parole and subject to the terms of his parole during the May 28, 2020 protest. Doc. 37 at 13. Indeed, a First Amendment retaliation claim requires Plaintiff to establish three things, the first being that Plaintiff "was engaged in constitutionally protected activity." *Hinkle v. Beckham Cnty. Bd. of Cnty. Commissioners*, 962 F.3d 1204, 1226 (10th Cir. 2020) (internal citation omitted). The Court disagrees that Plaintiff's participation in a BLM protest is not constitutionally protected activity merely because he was on parole. However, because the Court finds that Plaintiff's First Amendment retaliatory arrest

b. Plaintiff fails to show that the narrow exception in *Nieves* applies to his First Amendment retaliatory arrest claim.

The narrow exception the Supreme Court recognized in *Nieves* does not save Plaintiff's claim. First, as set forth above, Plaintiff's theory of liability sounds in retaliatory prosecution rather than in retaliatory arrest. And the narrow exception the Supreme Court recognized for retaliatory arrest claims does not extend to retaliatory prosecution claims. *Compare Nieves*, 139 S. Ct. at 1727 (creating a narrow exception in retaliatory arrest claim), *with Hartman*, 547 U.S. 250 (containing no similar exception in retaliatory prosecution claims). Second, even assuming Plaintiff's theory of liability could implicate the *Nieves* exception, Plaintiff has not presented objective evidence to support application of this exception.

In *Nieves*, the Supreme Court explained that "[a]lthough probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 139 S. Ct at 1727 (internal quotations and citations omitted). It created this exception because "an unyielding requirement to show the absence of probable cause could pose a risk that some police officers may exploit the arrest power as a means of suppressing speech." *Id.* To meet the *Nieves* exception, a plaintiff must present "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 1717.

Here, Plaintiff alleges that the *Nieves* exception applies, arguing that Defendants investigated Plaintiff's parole violation which "under New Mexico law is not the business of traditional law enforcement officers." Doc. 41 at 16. Plaintiff also argues that, at the time

---

claim fails due to the existence of probable cause, the Court need not address the traditional elements of a First Amendment claim.

27

Defendants arrested him, they did not suspect him of any specific crime since the District

Attorney's office rejected the tampering with evidence charge, indicating differential treatment

under *Nieves*. Doc. 66 at 4. The undisputed material facts, however, do not support these

assertions. Defendant Stone was investigating Plaintiff for driving the Kia away from the scene,

not for his parole violations, when he learned that Probation and Parole planned to issue an arrest

order for Plaintiff's parole violations. UMF No. 24, 31. And although the District Attorney's

office did reject the charge of tampering with evidence, on that same day, while the District

Attorney's was still considering Defendant Stone's request, Officer Langston sent Defendant

Stone the Arrest Order for parole violations. UMF Nos. 29-35. Defendants Stone and Brown

then arrested Plaintiff on the parole violation Arrest Order that Mr. Langston investigated,

authored, and provided to them. UMF No. 33, Supp. MF Nos. B, D-F, H.

And, more relevant to the central question of the *Nieves* exception, Plaintiff fails to point

to any objective evidence in the record that he was arrested when other similarity situated

individuals (i.e., those who committed similar parole violations) not engaged in the same sort of

protected speech (i.e., protesting police brutality) were not. As Justice Sotomayor points out in

her dissent, this *Nieves* objective-comparative evidence exception likely will be exceedingly

difficult for a plaintiff to meet.[23] 139 S. Ct. at 1741 (Sotomayor, J., dissenting). Some lower

courts have thus grappled with how to apply the exception. In *Lund v. City of Rockford, Illinois*,

the Seventh Circuit concluded that the *Nieves* "majority does not appear to be adopting a rigid

---

[23] Indeed, the Supreme Court recently granted a petition for writ of certiorari in a Fifth Circuit
case to decide whether objective comparative evidence related to how others are charged under a
particular statute (as opposed to comparative evidence about others engaging in the same
conduct who are not charged) can satisfy the *Nieves* exception. *Gonzalez v. Trevino*, 42 F.4th
487, 489 (5th Cir. 2022), cert. granted No. 22-1025, 2023 WL 6780371 (U.S. Oct. 13, 2023).
Plaintiff has not submitted objective evidence similar to that at issue in *Gonzalez*, however, and
so is not in the same situation as the plaintiff in *Gonzalez*.

rule that requires, in all cases, a particular form of comparison-based evidence." 956 F.3d 938, 945 (7th Cir. 2020). It reasoned that objective proof of retaliatory treatment is a fact-specific question that must be determined on a common sense, case-by-case basis. *Id.* But even applying the Seventh Circuit test here, Plaintiff "has made no attempt to present objective evidence showing that the police rarely make arrests [for conduct charged], or that other similarly situated persons were not arrested, and he has not demonstrated retaliation in some other way." *Id.* at 945-46. That is, even under the Seventh Circuit's interpretation of the *Nieves* exception, objective evidence is still required, and Plaintiff has presented none.

Plaintiff blames his lack of objective evidence on insufficient discovery responses provided by Defendants during Rule 56(d) discovery. *See* Doc. 54 (allowing Plaintiff to conduct Rule 56(d) discovery specifically as to possible discovery regarding the *Nieves* expectation). If Plaintiff believed Defendants answers were insufficient, he had a prior opportunity, while the parties were conducting that discovery, to clarify those responses. *See* Doc. 55 (parties' agreement as to Rule 56(d) discovery parameters, including that "Plaintiff maintains a right of reservation to seek leave from the Court to request the depositions of Defendants if the parties cannot resolve any claimed deficiencies"). Plaintiff, however, failed to ask the Court for such follow-up depositions. He also failed to move to compel complete responses to any answers he believed were insufficient, thereby waiving any such objection.[24] *See* D.N.M. LR-Civ. 26.6 (setting a 21-day deadline for a party served with discovery objections to move to compel and "failure to proceed within this time period constitutes acceptance of the objection").

---

[24] Indeed, the parties agreed to extend Plaintiff's deadline to file a motion to compel as to Rule 56(d) discovery, Doc. 67-2, but Plaintiff never filed such a motion.

However, even considering Plaintiff's objections at this stage does not save his argument that the *Nieves* exception applies. Plaintiff's first complaint concerns Interrogatory No. 6, in which he asked Defendants to "[p]lease state the number of arrest warrants you have issued, drafted, or have otherwise been involved in creating for technical probation and/or parole violations in the prior two years from the date of arrest for Mr. White on May 28, 2020, and the specific technical violation for each such arrest warrant." Doc. 66-2. Defendant Stone responded by stating that "Albuquerque Police Department officers do not issue arrest orders for probation and parole violations and I did not issue any such order for Mr. White. A probation or parole officer will issue any such order." Doc. 66-2. And Defendant Brown stated that "I was a supervisor within the ISU unit and as a supervisor I did not draft any arrest warrant affidavits from May 28, 2018 to May 28, 2020." Doc. 66-3.

Plaintiff argues that "[c]learly these Defendants failed to state whether they have 'otherwise been involved' in warrants for technical probation and/or parole violations, which leaves Plaintiff to infer that they have not."[25] Doc. 66 at 3. And, Plaintiff argues, "[g]iven Defendant Stone's documented back and forth with Officer Langston concerning Mr. White's parole violations, it underscores how exactly Mr. White was treated different[ly] than other parolees." *Id.* In other words, Plaintiff seems to be arguing that because APD is typically not involved in issuing, drafting, or otherwise creating parole violation arrest warrants, whereas Defendants were involved in creating the Arrest Order in Plaintiff's case (i.e., by the

---

[25] The Court disagrees that Defendants' responses are inadequate. Although Defendants did not specifically state that they have never "drafted, issued, or otherwise been involved in creating" arrest warrants for parole violations, their answers—that APD and ISU unit supervisors do not issue arrest warrant for parole violations—are responsive to the question. *See* Docs. 66-2, 66-3.

"documented back and forth" with Mr. Langston), Defendants arrested Plaintiff when they would not have arrested others who were similarity situated.

Among other reasons, this argument fails because the evidence in the record does not document a "back and forth with Officer Langston concerning Mr. White's parole violations" in which Defendants were involved in creating the Arrest Order for Plaintiff's parole violations. As discussed above, the evidence in the record documents that Mr. Langston received, from some officer at APD, a copy of the May 28 police report regarding Plaintiff and the Kia, and then requested from APD the lapel video, as is common when a parolee under his supervision has contact with an officer. Doc. 67-1 at 17:15-24, 18:24 to 19:3, 22:5-14. After Defendant Stone learned about the forthcoming Arrest Order, he asked Mr. Langston for a copy of it, which Mr. Langston sent. UMF Nos. 30, 31, 33. These facts do not document that Defendants Stone and Brown were involved in creating the Arrest Order. But even if they did, at best such facts would lend support to a retaliatory prosecution claim (which Plaintiff did not bring) as opposed to a retaliatory arrest claim (which Plaintiff did bring). And the *Nieves* exception does not apply to retaliatory prosecution claims.

Plaintiff also complains that Defendant Stone provided untruthful information during Rule 56(d) discovery as to his knowledge of Plaintiff's protest activity prior to Plaintiff's arrest. Doc. 66 at 3. In Request for Admission No. 1, Plaintiff asked Defendant Stone to admit: "You were aware or had knowledge of Mr. White's involvement in the Black Lives Matter protest at the time that you sought an arrest warrant for him." Doc. 66-4. Defendant Stone objected to this request as vague and compound but also denied it. *Id.* Plaintiff asserts that his answer is untruthful because "in a Criminal Complaint dated May 29, 2020 (that also details incidents on May 30, 2020), Defendant Stone details Mr. White's protest activity on May 28, 2020.

31

Defendant Stone sought and was denied approval for an arrest warrant on June 1, 2023, which demonstrates his untruthfulness in responding to RFA 1." Doc. 66 at 3.

The Court does not opine about whether Defendant Stone's response was incorrect[26] or, if it was incorrect, whether it was untruthful as opposed to simply mistaken. That is because, even assuming Defendant Stone provided an untruthful answer, Plaintiff fails to explain how such an answer impacts his burden to establish the *Nieves* exception. Even if Defendant Stone had answered "yes," (i.e., the answer Plaintiff believes to be truthful answer), it would establish only that Defendant Stone had knowledge of First Amendment protected activity. It would not establish that Defendant Stone arrested Plaintiff for parole violations when others similarly situated have not been arrested.

In sum, even if the *Nieves* expectation applies to the arrest of parolees for parole violations, and even if the success of Plaintiff's retaliatory arrest claim turned on this exception, Plaintiff has failed to meet his burden to point to objective evidence that he was arrested when otherwise similarly situated individuals not engaged in protected speech had not been. Thus, the *Nieves* exception does not save his First Amendment retaliatory arrest claim.

    c.   Defendants are entitled to qualified immunity on Plaintiff's First Amendment retaliatory arrest claim and Fourth Amendment unreasonable seizure claim.

In conclusion, the Court finds that Plaintiff has failed to meet his burden under the first prong of the qualified immunity analysis to show that Defendants Stone and Brown violated his constitutional right to be free from retaliatory arrest under the First Amendment and to be free from unreasonable seizure under the Fourth Amendment. The existence of probable cause

---

[26] The Court would not make such a finding without considering any response Defendant Stone might have.

defeats both those claims, and Plaintiff has failed to show that the *Nieves* exception applies to his First Amendment claim.

Even assuming, however, that he was able to show constitutional violations, Plaintiff must also show, under the second prong of qualified immunity, that his rights under the First and Fourth Amendments were clearly established by pointing to "a controlling case or robust consensus of cases" where an officer acting "under similar circumstances" to those faced by the defendants was found to have acted unlawfully. *D.C. v. Wesby*, 538 U.S. 48, 65 (2018). Plaintiff has failed to meet this burden. Regarding his Fourth Amendment claim, Plaintiff points to no clearly established law.

As to his First Amendment claim, Plaintiff cites a number of cases to argue generally that his speech about police conduct is protected by the First Amendment. Doc. 41 at 17-19. For example, he cites *Hartman*, 547 U.S. at 256, for the proposition that "the First Amendment prohibits government officials from subjecting individuals to retaliatory actions . . . for speaking out." Doc. 41 at 17. But, as set forth above, the Supreme Court in *Hartman* examined a retaliatory prosecution claim, not a retaliatory arrest claim and held that "[a] plaintiff in a retaliatory-prosecution action must plead and show the absence of probable cause for pressing the underlying criminal charges." 547 U.S. at 250. More significantly, because Plaintiff has not shown the absence of probable cause to support his parole violation arrest, *Hartman* does not help him.

Plaintiff also cites *McBeth v. Himes*, 598 F.3d 708, 717 (10th Cir. 2010), to discuss the three elements of a First Amendment claim—the plaintiff was engaged in constitutionally protected activity, the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity, and the

defendant's actions were substantially motivated as a response to the protected conduct. Doc. 41 at 17-18. But, in doing so, Plaintiff fails to address the additional matter that "[t]he plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Nieves*, 139 S. Ct. at 1724. And although Plaintiff cites *Nieves* to argue the law is clearly established that, even if probable cause exists, officers cannot retaliate against a person by arresting him for his protected speech if the officer typically exercises discretion not to conduct such an arrest, Doc. 69 at 4, as discussed above, Plaintiff fails to show that the narrow *Nieves* exception applies in this case.

Plaintiff also generally cites a series of cases to argue that police officers cannot make arrests for speech directed at the officers which the officers do not like. Doc. 41 at 18-19. But the undisputed facts show that Defendants arrested Plaintiff on a valid Arrest Order a probation officer issued and provided to them. And Plaintiff points to no clearly established law that would have put Defendants on notice that arresting Plaintiff based on the parole violation Arrest Order would violate his First Amendment right. Defendants are therefore entitled to qualified immunity.

## 2. Retaliatory Investigation

Though not in his briefs, Plaintiff asserted at oral argument that Defendants also violated his First Amendment rights by carrying out a retaliatory investigation. Plaintiff argued that Defendants surveilled him following the BLM protest, until they were able find a way to arrest him—the technical parole violations. The undisputed material facts, however, demonstrate that, by June 1, Defendant Stone was drafting an arrest warrant for tampering with evidence. Plaintiff provides no evidence that anyone at APD, much less Defendants, had put Plaintiff under surveillance between the BLM protest and June 1. As for the June 1 surveillance, the undisputed

facts show that, on that day, Defendant Stone had submitted to the District Attorney's office a request to charge and arrest Plaintiff for tampering with evidence. Keeping Plaintiff under surveillance for a short time while the DA was reviewing this request, so that Defendant Stone could arrest Plaintiff if the arrest warrant was approved, is different than keeping Plaintiff under surveillance for an extended period as a result of his organization of a BLM protest. Plaintiff fails to point to any clearly established law that would provide notice to a police officer that, while that officer's request to a prosecutor for arrest authorization is pending, it would be unconstitutional to maintain surveillance of the subject of the arrest warrant for a few hours. And here, before the prosecutor had rejected Defendant Stone's request to arrest Plaintiff on tampering with evidence charges, Defendant Stone received an independent justification to arrest Plaintiff—a probation officer's arrest order. UMF Nos. 29-35.

Finally, Plaintiff's retaliatory investigation claim fails because Plaintiff has not shown that he has a clearly established right to be free from retaliatory investigation. In *Hartman v. Moore*, the Supreme Court indicated that whether retaliatory investigation can amount to a constitutional tort is an open question. 547 U.S. at 262 n.9. And Plaintiff points to no clearly established law decided since *Hartman* to support such a claim. As such, to the extent Plaintiff brings a retaliatory investigation claim against Defendants, the Court finds they are entitled to qualified immunity.

## CONCLUSION

For these reasons, the Court grants Defendants Geoffrey Stone and Eric Brown's Motion for Summary Judgment Requesting Dismissal of Plaintiff's Complaint (Doc. 37).

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE